IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:17-cv- 00511-FL

|  |  |  |
|---|---|---|
| EPIC GAMES, INC. and EPIC GAMES INTERNATIONAL S.à.r.l., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT** |
| B.B., | ) ) | |
| Defendant. | ) ) | |

The Court should grant the Motion for Default Judgment filed by Plaintiffs, Epic Games,

Inc. and Epic Games International S.à.r.l. (collectively, "Plaintiffs" or "Epic") against Defendant

B.B. ("B.B." or "Defendant") because the Clerk of Court entered default against B.B. after he

failed to file a responsive pleading to the Complaint, and Epic has otherwise complied with all of

the requirements of Rule 55(b). Accordingly, Epic submits this Memorandum of Law and the

accompanying Declaration of Christopher M. Thomas and respectfully requests that the Court

grant Epic's Motion for Default Judgment against Defendant for the reasons provided below.

## I.      STATEMENT OF FACTS

### A.      Background on Epic and Fortnite

Epic, founded in 1991, is a Cary, North Carolina-based developer and publisher of

computer games, and computer game engine and content creation software. (D.E. 1 at ¶ 13.)

Epic first released its co-op survival and building action game, Fortnite®[1], on a limited basis in

---

[1] Fortnite is a registered trademark of Epic and is shown with the federal registration symbol the
first time the trademark appears herein and without it thereafter.

October 2013. (*Id.* at 14-17.) Fortnite was released more widely in July 2017 and its free-to-play "Battle Royale" game mode was released in September 2017. (*Id.* at ¶ 17.) Fortnite's popularity has grown steadily ever since and has become Epic's most popular game yet. (*See id.* at ¶¶ 18-19; *see also* Second Decl. of Thomas at ¶ 3.) In designing Fortnite, Epic made a conscious choice <u>not</u> to sell items to players that would give any player a competitive advantage to ensure a fair playing field for all players. (D.E. 1 at ¶ 20; Second Decl. of Thomas at ¶¶ 4-5.)

Epic is the author and owner of all rights, title, and interest in the copyrights in Fortnite, including without limitation, Fortnite's underlying computer software and the audio visual works created by the software. (*Id.* at ¶ 21.) Epic's copyrights in various versions of Fortnite's computer code are the subjects of U.S. Copyright Registration Nos. TXu01-895-864 (dated December 18, 2013), TX008-186-254 (dated July 14, 2015), TX008-254-659 (dated March 3, 2016), and TX008-352-178 (dated December 23, 2016). (*Id.* at Exh. A, [D.E. 1-1].) These registrations are valid and subsisting and are enforceable in the United States and Canada pursuant to Articles 2 and 3 of the Berne Convention. (*See id.* at ¶¶ 22-24, *id.* at Exh. B, [D.E. 1-2].) Further, to protect the copyrighted computer code comprising Fortnite, Epic put in place certain technological measures to effectively control access to the code. (*Id.* at ¶ 68.)

**B.    Epic's Terms of Service and End-User Licensing Agreement**

To use Epic's services, such as playing Fortnite on PC—which is the platform B.B. used to play (and cheat at) Fortnite—a user must create an account with Epic. (*Id.* at ¶ 25.) In so doing, a user affirmatively acknowledges that he or she has "read and agree[d] to the Terms of Service" ("Terms"). (*Id.*, at Exh. C [D.E. 1-3].) Because B.B. has been using Epic's services, he necessarily agreed to abide by the Terms. (*Id.* at ¶¶ 26-30, 37.) B.B. was banned at least once from using Epic's services for cheating, and, on information and belief, circumvented the ban by

creating numerous other accounts under false names in order to cheat in Fortnite. (*Id.* at ¶¶ 6, 67.)

The Terms include an "Intellectually Property Rights" section which sets forth the permissions users have with respect to Epic's intellectual property and activities that are prohibited. (*Id.* at ¶¶ 33-35.) The prohibited activities are set out in Paragraph 35 of the Complaint and include a prohibition against "copy[ing], modify[ing], creat[ing] derivative works of, publicly display[ing], publicly perform[ing,], republish[ing], or transmit[ting] any of the material obtained through [Epic's s]ervices." (*Id.* at ¶ 35.) The Terms also include a prohibition against using Epic's services for unlawful purposes. (*Id.* at ¶ 36.) Further, the Terms include a forum selection clause identifying federal courts in this District as the location for a lawsuit related to Fortnite. (*Id.* at ¶¶ 31-32.)

In order to play Fortnite on PC, a user must also acknowledge that he or she has read and agreed to abide by the terms in the Fortnite End-User License Agreement for PC (the "EULA"). (*Id.* at ¶ 40, *id.* at Exh. D, [D.E. 1-4].) Thus, because B.B. played Fortnite, he necessarily agreed to abide by the EULA. (*Id.* at ¶¶ 40-52.) Like the Terms, the EULA includes a section setting out prohibited activities. These prohibited activities include using Fortnite "commercially or for a promotional purpose;" copying, reproducing, distributing, displaying, or using Fortnite in a way that is not expressly authorized; reverse engineering, deriving source code from, modifying, adapting, translating, decompiling, or disassembling Fortnite, or making derivative works based on Fortnite; removing, disabling, circumventing, or modifying any proprietary notice of label or security technology included in Fortnite, or creating, developing, distributing, or using any unauthorized software programs to gain advantage in any online or other game modes. (*Id.* at ¶

47.) Further, like the Terms, the EULA includes a forum selection clause identifying federal courts in this District as the proper forum for a lawsuit related to Fortnite. (*Id*. at ¶ 44.)

### C. **B.B's Infringing Activities**

B.B. used cheat software ("cheats") while playing Fortnite to unlawfully modify Fortnite's software so that he had an unfair competitive advantage over other players. (*Id*. at ¶¶ 53-64.) The cheat software works by injecting unauthorized code into Fortnite's copyrighted code, modifying and altering the copyrighted code, and creating an unauthorized derivative work of Epic's copyrighted Fortnite game, which infringes Epic's copyrights in the game. (*Id*. at ¶¶ 63-65.)

Defendant was, at all times relevant to the Complaint, a moderator and member of the support staff of AddictedCheats.net, a cheat provider website (the "cheat provider") that supplied its registered users with cheats in exchange for money. (*Id*. at ¶ 58.) Defendant frequently promoted the cheats on the cheat provider's discussion channel and assisted the cheat provider's subscribers in enabling the cheats to run on Fortnite. (*Id*. at ¶ 59.) Further, Defendant stated that his goal was to use the cheats to create unwanted chaos and disorder in Fortnite, characterized Fortnite as the cheat provider's "highest priority," and even bragged that he is working on his own cheat to use in Fortnite. (*Id*. at ¶¶ 60-61.)

Moreover, in order to achieve his explicit goal of adversely impacting as many people as possible while playing and cheating at Fortnite, Defendant specifically targeted streamers. (*Id*. at ¶¶ 62-63.) He declared that it was his objective to prevent streamers from winning the game and boasted in online cheating discussion channels that his goal was "stream snip[ing]," i.e., killing streamers as they streamed. (*Id*.) Defendant has said that making streamers hate Fortnite describes Defendant's persona "in a nutshell." (*Id*.)

Case 5:17-cv-00511-FL   Document 22   Filed 06/13/18   Page 4 of 23

Epic, having learned of the efforts by Defendant and others to cheat by altering Fortnite's copyrighted code, put in place certain technological security measures to control and restrict access to Fortnite's copyrighted code. (*Id.* at ¶¶ 68; Second Decl. of Thomas at ¶¶ 6-7.) In response, Defendant actively modified his cheat to specifically engineer it to circumvent these technological measures. (D.E. 1 at ¶¶ 68-69.) Defendant also instructed cheat provider subscribers to do the same. (*Id.*) Defendant's modification has no commercially significant purpose or use other than to circumvent Epic's technological measures. (*Id.* at ¶ 70.) After circumventing Epic's technological measures, Defendant posted his circumvention method to the cheat provider's discussion channel so that other cheaters could use it and bragged: "Now my method is exposed[.]" (*Id.* at ¶ 71.)

### D. Epic's Service of the Complaint and B.B.'s Post-Filing Activity

Epic first attempted to serve Defendant via a Canadian process server on October 11, 2017, the same day that the Court issued the Summons in this case. (D.E. 7 at ¶ 7; *see also id.* at Exhs. A-B [D.E. 7-1, 7-2].) The first Canadian process server Epic engaged was unable to locate Defendant, so Epic engaged a second Canadian process server and investigator to attempt to locate Defendant. (*Id.*) That person was also unable to locate Defendant. (*Id.*) Epic then engaged a third Canadian investigator and process server, who did locate and serve Defendant and Defendant's mother in compliance with Fed. R. Civ. P. 4(f)(1) and Articles 10(b) and (c) of the Hague Convention. (*Id.*) Because Defendant's age was uncertain, Epic instructed the third Canadian process server to serve Defendant as a minor in compliance with Fed. R. Civ. P. 4(g) and Ontario R. Civ. P. 16.02(1)(j). Upon successful service of Defendant and Defendant's mother, Epic learned that Defendant is likely a minor. (D.E. 8 at ¶¶ 4, 5, Exh. 1.) Given the Defendant's probable minor status, Epic used the third Canadian process server to personally

serve the Declaration of Service, the Motion for Entry of Default, the Status Report Regarding Service of Process, and the various other papers from the docket of this case on both Defendant and Defendant's mother. (D.E. 14-15.)

Having not received a responsive pleading to the Complaint, Epic moved for entry of default on March 6, 2018. (D.E. 12.) On April 20, 2018, the Court granted Epic's Motion for Entry of Default after B.B. failed to respond to Epic's Motion. (D.E. 17.) To date, neither B.B. nor Ms. Broom have made an appearance in this case or contacted counsel for Epic. On May 23, 2018, the Court directed Epic to "proceed in accordance with Rule 55(b) of the Federal Rules of Civil Procedure to reduce this matter to judgment." (D.E. 18.)

## II.    LAW AND ARGUMENT

Once default has been entered under Rule 55(a) of the Federal Rules of Civil Procedure, Rule 55(b)(2) authorizes the court to enter default judgment against a properly served defendant who fails to file a timely responsive pleading. Fed. R. Civ. P. 55(b)(2). Where the defendant is a minor, a court may enter default judgment "only if [the minor] is represented by a general guardian, conservator, or other like fiduciary who has appeared." *Id.*

Upon default, the well-pleaded facts alleged in the complaint, as to liability, are deemed admitted. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001). However, "a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Id.* (internal citations omitted). A court must "determine whether the well-pleaded allegations in the plaintiff's complaint support the relief sought in the action." *DIRECTV, Inc. v. Pernites,* 200 F. App'x 257, 258 (4th Cir. 2006) (internal citations and quotations omitted). That a defendant defaulted "does not in itself warrant the court in entering a

default judgment. There must be a sufficient basis in the pleadings for the judgment entered." *Id.* Such a basis exists here.

### A. The Procedural Requirements of Entry of Default Judgment Have Been Met

The Court has subject matter jurisdiction over all the claims in the action.

The Court has subject matter jurisdiction over Epic's federal claims arising under the Copyright Act under 28 U.S.C. §§ 1331 and 1338(a). (D.E. 1 at ¶ 7); *see Sweepmasters Prof'l Chimney Servs., LLC v. Vanessa Servs.*, No. 1:16CV439, 2017 WL 3927626, at *2 (E.D. Va. July 5, 2017), *report and recommendation adopted*, No. 1:16-CV-439, 2017 WL 3927602 (E.D. Va. Sept. 7, 2017) (holding that the court had subject matter jurisdiction over the plaintiff's claims arising under the Copyright Act "because the dispute arises under the Copyright Act, as amended, 17 U.S.C. §§ 101 *et seq.*"). This Court also has subject matter jurisdiction over Epic's state law claims under 28 U.S.C. § 1367 because these claims are so related to federal claims in the action, over which this Court has such original jurisdiction, that they form part of the same case or controversy. (D.E. 1 at ¶ 7); *see Sweepmasters Prof'l Chimney Servs., LLC*, 2017 WL 3927626, at *2 (holding that the court had subject matter jurisdiction over the plaintiff's claims arising under state law "as plaintiff's claims are so relate to the claims within the Court's original jurisdiction that it is part of the same case or controversy").

Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and 1400(a) because this is a district in which a substantial part of the events giving rise to Epic's claims occurred, in which B.B. committed acts of copyright infringement, and/or where Epic's injuries were suffered. (D.E. 1 at ¶ 9); *see Sweepmasters Prof'l Chimney Servs., LLC*, 2017 WL 3927626, at *2 (holding that venue was proper because "a substantial part of the alleged acts of infringement occurred in this District."). Further, B.B. may be sued in any judicial district under 28 U.S.C. § 1391(c)(3)

because B.B. is not a resident of the United States. (D.E. 1 at ¶ 9); *see 3M Co. v. Christian Investments LLC*, No. 1:11CV0627 TSE/JFA, 2012 WL 5531343, at *5 (E.D. Va. Aug. 2, 2012), *report and recommendation adopted sub nom.*, *3M Co. v. Directi Internet Sols. Pvt. Ltd*., No. 1:11CV627, 2012 WL 5527154 (E.D. Va. Nov. 13, 2012) (holding that venue was proper in any judicial district, including the one in which plaintiff sued, because defendant was not a resident of the United States).

Moreover, this Court also may properly exercise personal jurisdiction over B.B. because, by agreeing to Epic's Terms and EULA, B.B. agreed to be subject to the exercise of jurisdiction over him by the courts in this District. (D.E. 1 at ¶ 8); *see Automattic Inc. v. Steiner*, 82 F. Supp. 3d 1011, 1022 (N.D. Cal. 2015) (holding that "Defendant's conduct of accepting the terms of service is sufficient to constitute consent to personal jurisdiction in California"). B.B. also purposefully availed himself of the privileges of conducting activities and doing business in this District thereby invoking the benefits and protections of this State's laws, by entering into contractual agreements with Epic in this State, and repeatedly accessing Epic's servers, which are located in this District. (D.E. 1 at ¶ 8.)

B.B. neither appeared nor responded to the Complaint, (D.E. 10), nor has he made any attempt to contact Epic or counsel for Epic. Additionally, despite proper service, B.B. has failed to respond to the Motion for Entry of Default filed by Epic. (D.E. 12.) Indeed, as recited above, Epic has taken significant efforts to locate and serve B.B. and has expended significant resources doing so. Epic engaged three different process servers to properly effect personal service upon Defendant and his mother.

As is reflected in Epic's Declaration of Service and its Amended Certificates of Service, Epic was careful to ensure that the applicable rules were followed in every instance of service.

(D.E. 8, 14, 15.)  B.B. and his mother were properly served under Articles 10(b) and (c) of the Hague Convention, to which Canada is a signatory, and Ontario R. Civ. P. 16.02(1)(j).  (*See* Hague Convention art. 10(b) & (c), Nov. 15, 1965, 20 U.S.T. 361.)  Articles 10(b) and (c) permit service within a contracting state "through . . . competent persons of the State of destination."  *Id.* The courts in Ontario have interpreted this to mean that service may be properly effected "through the normal procedures for service permitted within the contracting state."  *Pitman v. Mol*, 2014 ONSC 2551, at para. 54.  Under the Ontario Rules of Civil Procedure, a minor is to be served by "leaving a copy of the document . . . with the minor . . . where the minor resides with a parent . . . [and] by leaving another copy of the document with the parent . . .."  Ontario R. Civ. P. 16.02(1)(j).  Plaintiffs met these requirements.  (See D.E. 9 at ¶¶ 5-7.)

The requirement set out in Federal Rule of Civil Procedure 55(b)(2) that "default judgment may be entered against a minor only if represented by a general guardian . . . who has appeared" will be met upon the Court's selection of a guardian ad litem for B.B., as requested by Epic's Motion for Appointment of Guardian ad Litem for B.B. filed contemporaneously herewith.  *See* Fed. R. Civ. P. 55(b)(2).

Given B.B.'s failure to address Plaintiff's allegations of:  (i)  copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq.*; (ii) contributory copyright infringement in violation of the Copyright Act, §§ 106 and 501, *et seq.*; (iii) circumvention of in technological measures in violation of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201, *et seq.*; (iv) breach of contract in violation of North Carolina law; and (v) intentional interference with contractual relations in violation of North Carolina law, Epic respectfully requests that this Court enter default judgment against B.B. and award to Epic a permanent injunction as set forth in the Complaint.  (D.E. 1.)

**B. Epic's Well-Pleaded Complaint Pleads Each Element of Direct Copyright Infringement in Violation of the Copyright Act, 17 U.S.C. §§ 106 And 501, *et seq.***

The essential elements of a claim for direct copyright infringement under the Copyright Act are:

> (1) the asserted work is an original work of authorship and copyrightable subject matter;
> (2) the plaintiff owns or has exclusive rights to all right, title, and interest in the work;
> (3) the defendant's actions infringe plaintiff's copyrights in the asserted work by copying, reproducing, preparing derivative works from, and/or displaying the asserted work publicly without plaintiff's permission; and
> (4) the defendant's copies, reproductions, derivative works, and displays are identical and/or substantially similar to plaintiff's.

*See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002).

Each one of these elements is established in Plaintiffs' well-pleaded Complaint. The first two elements of the claim are satisfied by Epic's allegations that it owns the copyrights in Fortnite's computer code. (D.E. 1 at ¶¶ 22-23, 73-74; *id.* at Exh. A [D.E. 1-1]) (showing Epic's U.S. copyright registrations in the Fortnite code); *see Nelson-Salabes, Inc.*, 284 F.3d at 513 (holding that proof of plaintiff's copyright registration certificates are sufficient to meet the first two elements of the test).

Epic established the third element by alleging that B.B. prepared derivative works of Fortnite without Epic's authorization. (D.E. 1 at ¶¶ 65, 74-78.) As stated in the Complaint:

> the cheat software used by Defendant (and those whom Defendant induces to use such software) improperly injects unauthorized code into the active memory of the game as it runs. . . . This unauthorized **modification of the game's code as it runs** on the cheater's computer **and of the code that is sent back to Epic's servers materially changes both the game's code and the audio visual aspects of the game generated by the code.** These **changes create a different version of the Fortnite game** than the

> Fortnite game that is generated by Epic's copyright protected
> software.

(D.E. 1 at ¶¶ 64-65; *see also id.* at ¶¶ 4, 76) (emphasis added). *See also* 17 U.S.C. § 106(2) (listing the right "to prepare derivative works based upon the copyrighted work" as one of the copyright holder's exclusive rights); 17 U.S.C. § 101 (defining "derivative work" as "a work based upon one or more preexisting works . . . [in any] form in which a work may be recast, transformed, or adapted.") Accordingly, Epic has alleged that B.B.'s use of the cheat software creates unauthorized derivative works based on Fortnite in violation of the Copyright Act. (D.E. 1 at ¶¶ 72-83.)

Epic has also alleged that the unauthorized derivative work prepared by B.B. is substantially similar to Fortnite. (*Id.* at ¶¶ 63-64, 75-77.) As described in the Complaint, B.B.'s cheating creates an unauthorized version of Fortnite in which the copyright-protected code is modified by other code injected by B.B., which materially alters the game's code and the audio visual work the code creates and arms cheaters with valuable skills that other players, who are not cheating, do not have. (*Id.* at ¶¶ 55, 64.)

Epic also alleged that B.B. had access to Fortnite and that B.B. used Epic's services, including Fortnite. (*Id.* at ¶¶ 6, 75) (alleging, *inter alia*, that B.B. has been banned from playing Fortnite.) Accordingly, because Epic's Complaint has established all of the elements of a claim for direct copyright infringement, and because these allegations are deemed admitted upon B.B.'s default, Epic's Motion should be granted. (*Id.* at ¶¶ 72-83); *see also Joe Hand Promotions, Inc. v. Blackburn,* No. 7:11-CV-276-BO, 2013 WL 4068165, at *1 (E.D.N.C. Aug. 12, 2013) ("In granting default judgment, well-pleaded factual allegations are sufficient to establish a defendant's liability.").

**C.** **Epic's Well-Pleaded Complaint Pleads Each Element of Contributory Copyright Infringement in Violation Of The Copyright Act, 17 U.S.C. §§ 106 And 501, *et seq.***

The essential elements of a claim for contributory copyright infringement are that the defendant (1) has knowledge of a third party's infringing activity; and (2) induces, causes, or materially contributes to the infringing conduct. *See Thomson v. HMC Grp.*, No. CV1303273DMGVBKX, 2014 WL 12589313, at *5 (C.D. Cal. July 25, 2014).

Epic's well-pleaded Complaint establishes the first element by alleging that B.B. had constructive *and* actual knowledge that other cheaters were engaging in the same infringing activity as B.B. (D.E. 1 at ¶¶ 89-90.)  In establishing the second element, Epic alleged that B.B. is a moderator and support person for a cheat provider website and that he "materially contributes to the direct infringement of Epic's copyrights by other cheaters by touting the cheats in posts on online forums and/or discussion channels, actively encouraging and inducing other[s] . . . to purchase the cheats, and supporting their use of the cheats on Fortnite." (*Id.* at ¶¶ 86-88; *see also id.* at ¶¶ 58-63.)  Further, Epic alleged that, upon learning that Epic had put in place technological security measures that were blocking the function of his Fortnite cheat, B.B. modified the cheat and instructed others as to how to modify the cheat via the cheat provider. (*Id.* at ¶¶ 68-69; 103.) Epic also alleged that, on information and belief, B.B. "obtains some financial benefit or value in consideration for his work on the cheat provider website." (*Id.* at ¶ 91.)

The Complaint also alleges that B.B.'s activities directly infringed Epic's copyrights. (*See, supra,* Section III(B)) (citing D.E. 1 at ¶¶ 72-83.)  Because Epic's Complaint has established all of the elements of a claim for contributory copyright infringement, and because

these allegations are deemed admitted upon B.B.'s default, Epic's Motion should be granted. (*Id.* at ¶¶ 84-98); *see also Joe Hand Promotions, supra.*

**D.**    **Epic's Well Pleaded Complaint Pleads Each Element of Circumvention of Technological Measures in Violation of the Digital Millennium Copyright Act**

The essential elements of a claim for circumvention of technological measures in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a)(1) ("DMCA") are:

> (1) the asserted work is an original work of authorship and copyrightable subject matter;
> (2) the plaintiff owns or has exclusive rights to all right, title, and interest in the work;
> (3) the plaintiff has put in place a technological measure that effectively controls access to the asserted work in order to protect the exclusive rights of the plaintiff;
> (4) the defendant's service comprises or contains technologies, products, services, devices, components, or parts thereof that are primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to the asserted work; and
> (5) the defendant's service has no commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to the asserted work.

*See JCW Software, LLC v. Embroidme.com, Inc.,* No. 10-80472-CIV, 2012 WL 13015051, at *8 (S.D. Fla. May 29, 2012); *see also MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928, 946 (9th Cir. 2010)*, as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). Under the DMCA, "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(A); *see JCW Software, LLC.,* 2012 WL 13015051, at *8-*9. Further, the DMCA provides that to "'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological

measure, without the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(B); *see also JCW Software, LLC,* 2012 WL 13015051, at *8-*9.

Epic has established the first two elements of the claim by alleging that it owns the copyrights in Fortnite's computer code. (D.E. 1 at ¶¶ 22-23, 73-74, 100; *id.* at Exh. A [D.E. 1-1]) (showing Epic's U.S. copyright registrations in the Fortnite code); *see Nelson-Salabes, Inc.,* 284 F.3d at 513 (holding that proof of plaintiff's copyright registration certificates are sufficient to meet the first two elements of the test).  Epic has also established the third element of its claim by alleging that it "designed technological security measures to prevent and control unauthorized access to Fortnite" and that these technological security measures have been "implemented . . . to protect [Epic's] copyrighted works."  (D.E. 1 at ¶¶ 68, 101; *see also* Second Decl. of Thomas at ¶¶ 6-8) (stating that the technological security measures put in place by Epic require "the application of information, or a process or a treatment, with the authority of Epic, to gain access to Fortnite.").  Epic put these technological security measures in place in order to protect its copyrighted work from the efforts of cheaters, like B.B., who cheat in Fortnite.  (D.E. 1 at ¶ 68.)

As to the fourth element of the claim, Epic alleged that, once it had put the aforementioned technological security measures in place in order to protect Fortnite and prevent B.B. and others from cheating, B.B. modified his cheat with the primary and specific aim of circumventing Epic's modifications. (*Id.* at ¶¶ 69, 102, 104-105.)

Epic's well-pleaded Complaint further alleged that B.B.'s cheat "contains technologies, products, services, devices, components, or parts . . . primarily designed" to circumvent the technological security measures Epic put in place to protect Fortnite given that B.B.'s modification to his cheat enabled the cheat to bypass Epic's technological security measures and enabled B.B. to continue to cheat at Fortnite.  (*Id.* at ¶¶ 69, 102, 104-105; *see also* Second Decl.

of Thomas at ¶¶ 6-8 (stating that B.B.'s cheat modification circumvented Epic's technological security measures as it "avoided, bypassed, removed, deactivated, or impaired a technological measure, without Epic's authority").

The facts alleged in the Complaint indicate that B.B.'s modification to his cheat was made primarily to circumvent Epic's technological security measures protecting Fortnite. As alleged in the Complaint, B.B. stated that his goal was to use the cheats to wreak havoc in Fortnite and destroy the enjoyment of streamers, and those who watch them, in Fortnite. (D.E. 1 at ¶¶ 60, 62, 69.) This goal could only be accomplished upon successful modification of the cheat. *Id.* B.B. confirmed that his primary goal in modifying his cheat, and posting the instructions so that others could modify it, was to circumvent Epic's technological security measures. (*Id.* at 69, 71.) Further, as a moderator and support staff member of the cheat provider, which, on information and belief, provided B.B. with monetary compensation or other value, B.B. had a financial interest in posting usable cheats for popular video games such as Fortnite. (*See id.* at ¶¶ 58-59, 69.)

Epic has satisfied the fifth element of the claim because it has pleaded that B.B.'s cheats have no commercially significant purpose or use other than to circumvent Epic's technological security measures in order to enable the cheat-user to unlawfully cheat in Fortnite. (*Id.* at ¶ 105.) Accordingly, because Epic's Complaint establishes all of the elements of a claim for circumvention of technological measures in violation of the DMCA, and because these allegations are deemed admitted upon B.B.'s default, Epic's Motion should be granted. (*Id.* at ¶¶ 99-111). *See also Joe Hand Promotions, supra*.

### E. Epic's Well-Pleaded Complaint Establishes a Breach of Contract Claim

Epic's Complaint established a claim for breach of contract because it alleges (1) the existence of a valid contract; and (2) subsequent breach of the contract's terms. *See Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015). Epic has established the first element as it has alleged that valid, enforceable contracts exist between B.B. and Epic under the Terms and the EULA because Defendant agreed to be bound by the terms of each of those agreements by affirmative agreement, creating an account with Epic, and repeatedly using, downloading, playing and/or accessing Fortnite. (D.E. 1 at ¶¶ 38, 51, 112-119.)

Epic also established the second element because it alleged that B.B.'s activities including, *inter alia*, the creation of unauthorized derivative works based on Fortnite, using, accessing or modifying Fortnite in a way not authorized by the Terms and the EULA, and creating, distributing, and using unauthorized software programs to gain an advantage in Fortnite, all of which constitute material breaches of the Terms and the EULA. (*Id.* at ¶¶ 5-6, 39, 52, 54-57, 58-65, 66, 67-71, 120) (alleging that B.B. "knowingly, intentionally, and materially breached the Terms and the EULA" by engaging in the aforementioned activities). Accordingly, because Epic's Complaint has established all of the elements of a claim for breach of contract, and because these allegations are deemed admitted upon B.B.'s default, Epic's Motion should be granted. (*Id.* at ¶¶ 112-121); *see also Joe Hand Promotions, supra*.

### F. Epic's Well-Pleaded Complaint Establishes a Claim of Intentional Interference With Contractual Relations

The essential elements of a claim for intentional interference with contractual relations are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person;
> (2) the defendant knows of the contract;
> (3) the defendant, without justification, intentionally induces the third person not to perform the contract; and
> (4) resulting in actual damage to the plaintiff.

*Red Arrow v. Pine Lake Preparatory, Inc. Bd. of Directors*, 226 N.C. App. 431, 741 S.E.2d 511 (2013).

Epic alleged that valid and enforceable contracts exist between Epic and users of its services, including B.B. (D.E. 1 at ¶¶ 122-127.) Epic further alleged that B.B. knew the terms of those agreements and knew that other users of Epic's services are required to agree to abide by the Terms and the EULA, because he entered into those same contracts. (*Id.* at ¶ 128.)

The Terms and the EULA explicitly list activities from which users are prohibited from engaging. Epic alleged that B.B.'s intentional, active, and willful encouragement and inducement of users of Fortnite to purchase and use the cheats, with knowledge that this activity breaches both the EULA and the Terms, constitutes intentional interference with contracts formed between Epic and its users. (*Id.* at ¶¶ 58-61, 128-130.) Epic also alleged that B.B. engaged in this misconduct without justification. (*Id.* at ¶ 131.) Finally, Epic alleged that B.B.'s intentional inducement of others resulted in actual damage to Epic, e.g., that Epic suffered a loss of goodwill among users of Epic's services, decreased profits, and lost profits from users whose accounts Epic terminated for violations of the Terms and the EULA. (*Id.* at ¶¶ 122-135.) In light of the above, Epic's Complaint pleads all the elements required in a claim for intentional interference with contractual relations, and because these allegations are to be admitted, Epic's Motion should be granted. (*Id.* at ¶¶ 122-135); *see also Joe Hand Promotions, supra*.

## G.    Epic is Entitled to Permanent Injunctive Relief

The Copyright Act provides that a court may "grant . . . final injunctions on such terms as

it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

The DMCA provides, using similar language, that a court may "grant . . . permanent injunctions on such terms as it may deem reasonable to prevent or restrain a violation . . ." 17 U.S.C. § 1203(b). A permanent injunction "is appropriate where the nature of the infringement prevents an adequate remedy at law, and . . . where a threat of continuing infringement exists." *Id.* Courts have the authority to grant injunctions in default judgment actions involving copyright infringement. *See, e.g., Arista Records LLC v. Gaines*, 635 F. Supp. 2d 414, 417 (E.D.N.C. 2009) (granting plaintiff's motion for default judgment and for permanent injunction in copyright infringement case); *Nexon Am. Inc. v. Kumar, No. 2:11-CV-06991-ODW, 2012 WL 1116328*, at *7 (C.D. Cal. Apr. 3, 2012) (granting plaintiff's motion for default judgment and for permanent injunction in a case involving a violation of the DMCA.)

Epic respectfully requests that this Court issue a permanent injunction enjoining B.B. from continuing to infringe any of Epic's copyrighted works and/or induce or materially contribute to the direct infringement of Epic's copyrighted works by others; from using any technology, product, service, or device, part of which is primarily designed for the purpose of circumventing a technological measure that effectively controls access to Epic's copyright-protected work, including, without limitation, Fortnite; from violating the Terms; from violating the EULA; and/or from intentionally interfering with Epic's contractual relations with other parties to those agreements. Epic further requests that the Court order destruction of all infringing videos and copies of cheats or hacks in Defendant's possession, custody, or control that can be used to infringe Epic's copyrights in Fortnite so as to restrain Defendant's continued violations of Epic's copyrights in Fortnite. Epic also requests that the Court's order be recognized as final and enforceable in all contracting countries to the Berne Convention,

including the United States and Canada, under Articles 2 and 3 of the Berne Convention.

In order to obtain a permanent injunction, Epic must prove that "(1) it suffered an irreparable injury; (2) the remedies available at law, such as monetary damages, are inadequate compensation for that injury; (3) considering the balance of hardships between the parties, equitable relief is warranted; and (4) the public interests would not be disserved by a permanent injunction." *Christopher Phelps & Assocs, LLC v. Galloway*, 492 F3d 532, 543 (4th Cir. 2007) (citing *eBay, Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 126 S. Ct. 1837, 1840 (2006), considering *eBay* factors in copyright infringement case and noting that irreparable injury often occurs when owner of intellectual property is deprived of ownership rights). Here, all four of the above-referenced factors weigh in favor of granting a permanent injunction.

### 1. Epic Has Suffered and Will Continue To Suffer Irreparable Injury

Epic, the owner of the copyrights in Fortnite, has experienced immense success with the game, and has developed substantial and valuable goodwill in Fortnite (D.E. 1 at ¶¶ 13-18; Second Decl. of Thomas at ¶ 3.) B.B.'s actions cannot be "undone, erased, or destroyed" and represent an ongoing threat to the integrity of the game and its appeal to players and those who watch people play Fortnite (i.e. streamers.), and, accordingly, "represent[] the very essence of irreparability." *See Controversy Music v. Mason,* No. 5:09-CV-488-BR, 2010 WL 2607229, at *4 (E.D.N.C. June 24, 2010) (granting plaintiff's motion for default judgment and permanent injunction in connection with a copyright infringement suit where defendant engaged in unauthorized public performance of plaintiff's works). Moreover, the Fourth Circuit has held that "[i]rreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights." *Id.* (citing *Christopher Phelps & Assocs., LLC*, 492 F.3d at 544). Further to this, B.B. has created and distributed a cheat that could be shared in

perpetuity, causing Epic to continue to suffer irreparable harm. (D.E. 1 at ¶¶ 50-77.) Accordingly, this favor weighs in favor of granting the permanent injunction.

### 2. Monetary Damages are Inadequate to Compensate for Damage to Plaintiff's Reputation

Any monetary damages awarded to Epic would only compensate Epic for the infringing and improper activity in which B.B. already engaged. No monetary damages would be awarded for any *future* infringing and improper activity resulting from others' continued use of the cheat propagated by B.B. Accordingly, monetary damages would not compensate Epic. *See UMG Recordings, Inc. v. Blake*, No. 506-CV-00120-BR, 2007 WL 1853956, at *3 (E.D.N.C. June 26, 2007) (granting plaintiff's motion for permanent injunction and holding that monetary damages would "only compensate for Defendant's one-time infringement of each [music] recording, and not for inevitable future transfers"); *see also Nexon Am. Inc.*, 2012 WL 1116328, at *7 (granting plaintiff's request for permanent injunction for violation of the Copyright Act and the DMCA and holding that monetary damages would be insufficient to "prevent or deter the adverse, long-term effect" of Defendant's actions).

Furthermore, given that B.B.'s actions demonstrate that he intends to continue to infringe, induce others to cheat, violate the DMCA, and breach the Terms and the EULA, a permanent injunction is required as "a substantial amount of speculation and guesswork [would render] the calculation of future damages and profits difficult or impossible." *Controversy Music*, No. 5:09-CV-488-BR, 2010 WL 2607229, at *4 (internal citations and quotations omitted). In light of the above, this factor militates in favor of finding that this element has been satisfied.

### 3. The Balance of Hardships Weighs In Favor of Injunctive Relief

The balance of hardships unquestionably weighs in favor of granting the injunction. The permanent injunction merely prevents B.B. from violating the law. It does not constitute a

hardship at all. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 1:04CV00977, 2007 WL 4262725, at *3 (M.D.N.C. Nov. 30, 2007). The hardship clearly lies with Epic as B.B. has propagated a cheat that could be shared in perpetuity and continue to cause damage to Epic's reputation, market share, and relationship with its current and future customers. *UMG Recordings, Inc.*, No. 506-CV-00120-BR, 2007 WL 1853956, at *3 (granting plaintiff's permanent injunction and holding that "a distinct hardship rests with Plaintiffs" given defendant's ability to "replicate [Plaintiffs'] recordings into infinity"); *Nexon Am. Inc.*, 2012 WL 1116328, at *7 (granting plaintiff's motion for a permanent injunction for violation of the Copyright Act and the DMCA and holding that the injunction "imposes little-if any- hardship on Defendants"). Accordingly, this factor weighs in favor of granting a permanent injunction.

### 4. The Public Interest Will Be Served by Entry of Permanent Injunction

Courts have held that "there is a substantial public interest in preserving a copyright holder's exclusive rights." *Nexon Am. Inc.*, 2012 WL 1116328, at *7. Further, no public interest will be served by not enjoining B.B. from continuing this activity. *Controversy Music*, No. 5:09-CV-488-BR, 2010 WL 2607229, at *4. It is in the public interest to grant Epic's injunction in order to preserve the environment of fair play Epic strives to create for users. Accordingly, the entry of a permanent injunction will serve the public interest.

## III. CONCLUSION

For all of the foregoing reasons, Epic respectfully requests that its Motion for Default Judgment be granted.

This the <u>13th</u> day of June, 2018.

/s/ Christopher M. Thomas
Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Tasneem A. Dharamsi
N.C. State Bar No. 47697
tasneemdelphry@parkerpoe.com
PARKER POE ADAMS & BERNSTEIN LLP
150 Fayetteville Street, Suite 1400
Post Office Box 389
Raleigh, North Carolina 27602-0389
Telephone:  (919) 828-0564
Facsimile:   (919) 834-4564


*Attorneys for Plaintiffs*
*Epic Games, Inc. and Epic*
*Games International S.à.r.l.*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT** was electronically filed this day with the Clerk of Court using the CM/ECF system and is available to B.B. c/o Christine Broom via PACER. Copies will be served on both B.B. and Christine Broom as soon as we are properly able to serve them, at which point undersigned counsel will file an amended certificate of service.

This the 13th day of June, 2018.

/s/ Christopher M. Thomas
Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Tasneem A. Dharamsi
N.C. State Bar No. 47697
tasneemdelphry@parkerpoe.com
PARKER POE ADAMS & BERNSTEIN LLP
150 Fayetteville Street, Suite 1400
Post Office Box 389
Raleigh, North Carolina 27602-0389
Telephone:  (919) 828-0564
Facsimile:   (919) 834-4564